**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Southern Division)

| | |
|---|---|
| **JOSEPH MOGAN**<br>1300 Oretha Castle Haley Boulevard<br>Apartment A505<br>New Orleans, Louisiana 70113<br>(Orleans Parish)<br><br>– Individually and on Behalf of All Others<br>Similarly Situated –<br><br>                       **Plaintiff,**<br><br>    **v.**<br><br>**ALTIMMUNE, INC.**<br>910 Clopper Road<br>Suite 2015<br>Gaithersburg, Maryland 20878<br>(Montgomery County)<br><br>**VIPIN K. GARG**<br>c/o 910 Clopper Road<br>Suite 2015<br>Gaithersburg, Maryland 20878<br>(Montgomery County)<br><br>**RICHARD I. EISENSTADT**<br>c/o 910 Clopper Road<br>Suite 2015<br>Gaithersburg, Maryland 20878<br>(Montgomery County)<br><br>**M. SCOTT HARRIS**<br>c/o 910 Clopper Road<br>Suite 2015<br>Gaithersburg, Maryland 20878<br>(Montgomery County)<br><br>                       **Defendants.** | **Case No.**<br><br><br>**CLASS ACTION**<br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joseph Mogan ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Altimmune, Inc. ("Altimmune" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.   Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Altimmune securities between December 1, 2023 and April 26, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Altimmune is a clinical stage biopharmaceutical company that focuses on developing treatments for obesity and liver diseases.   The Company's lead product candidate is pemvidutide, a glucagon-like peptide-1 ("GLP-1") agonist for the treatment of obesity and metabolic dysfunction-associated steatohepatitis ("MASH").   GLP-1 agonists are medications that help lower blood sugar levels and promote weight loss.

1

3.      On November 30, 2023, Altimmune announced topline results from its 48-week MOMENTUM Phase 2 trial evaluating pemvidutide for the treatment of obesity (the "MOMENTUM Trial").  According to the Company, at week 48, subjects receiving pemvidutide achieved mean weight losses of 10.3%, 11.2%, 15.6% and 2.2% at the 1.2 mg, 1.8 mg, and 2.4 mg doses and placebo, respectively, with a near-linear trajectory of continued weight loss observed on the 2.4 mg dose at the end of treatment.  Defendants touted the significance of these results to pemvidutide's clinical and commercial prospects as they purportedly evidenced the drug's viability to compete with other GLP-1 agonists targeting weight-loss.  Pemvidutide's ability to compete with other GLP-1 agonists targeting weight-loss was particularly important to analysts and investors given the Company's need to establish a strategic partnership with, or otherwise be acquired by, more established biopharmaceutical companies with the cash and capital needed to ensure funding for the drug's future.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Altimmune overstated the potential for pemvidutide to stand out from competing GLP-1 agonists based on the drug's efficacy and tolerability results observed in the MOMENTUM Trial; (ii) accordingly, the MOMENTUM Trial results were less significant to pemvidutide's clinical, commercial, and competitive prospects than Defendants had led investors to believe; (iii) as a result of all the foregoing, Defendants had overstated Altimmune's prospects for finding a strategic partner to develop pemvidutide; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.     On February 13, 2024, Kerrisdale Capital published a report (the "Kerrisdale Report") alleging that "a deeper examination of Altimmune's data reveals a drug with little chance of competing against either the approved incumbents or the other GLP-1 agonists progressing through clinical trials." In particular, the Kerrisdale Report found that "[e]ven if pemvidutide *did* result in 15.6% weight-loss, that's not good enough" because competing, already approved GLP-1 agonists "semaglutide and tirzepatide (Ozempic and Mounjaro) have demonstrated superior weight-loss on a comparable basis, with the added benefit of controlling blood-sugar (which pemvidutide does not)," while noting that "pemvidutide's tolerability is atrocious" compared to these same drugs. (Emphasis in original.) Accordingly, the Kerrisdale Report concluded that "[w]e don't think legitimate prospective partners want to spend hundreds of millions of dollars and years of trials pursuing an obvious dead end."

6.     On this news, Altimmune's stock price fell $1.94 per share, or 18.65%, to close at $8.46 per share on February 13, 2024.

7.     Then, on April 29, 2024, *Bloomberg* published an article entitled "Altimmune Down as Guggenheim Sees Overhang in No Partnership," reporting that "Guggenheim Securities downgraded [Altimmune's] stock to neutral from buy saying [a] partnership for the biotech's lead asset pemvidutide look[s] 'increasingly unlikely.'" In particular, Guggenheim Securities stated that the opportunity to successfully fund pemvidutide's future as a treatment for obesity through a strategic partnership was "growing increasingly tenuous" and that "[t]he failure of a partner to emerge now five months from the end of Ph[ase] 2 presents an overhang that can no longer be ignored" as "a major partnership or M&A event would have materialized already if pem[vidutide] was viewed as a serious competitor in the growing obesity/ NASH landscapes by potential strategics or investors[.]"

8.      On this news, Altimmune's stock price fell $0.87 per share, or 11.98%, to close at $6.39 per share on April 29, 2024.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Altimmune is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired Altimmune securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Altimmune is a Delaware corporation with principal executive offices located at 910 Clopper Road, Suite 2015, Gaithersburg, Maryland 20878.  Altimmune's common stock trades in an efficient market on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "ALT".

16.     Defendant Vipin K. Garg ("Garg") has served as Altimmune's President and Chief Executive Officer at all relevant times.

17.     Defendant Richard I. Eisenstadt ("Eisenstadt") has served as Altimmune's Chief Financial Officer at all relevant times.

18.     Defendant M. Scott Harris ("Harris") has served as Altimmune's Chief Medical Officer at all relevant times.

19.     Defendants Garg, Eisenstadt, and Harris are collectively referred to herein as the "Individual Defendants."

20.     The Individual Defendants possessed the power and authority to control the contents of Altimmune's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Altimmune's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Altimmune, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

21.     Altimmune and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Altimmune is a clinical stage biopharmaceutical company that focuses on developing treatments for obesity and liver diseases.  The Company's lead product candidate is pemvidutide, a GLP-1 agonist for the treatment of obesity and MASH.  The Company's Phase 2 MOMENTUM Trial evaluated the efficacy, safety, and tolerability of pemvidutide in treating obesity at multiple dosage arms as compared to placebo.

23.     GLP-1 agonists are a class of drugs that help lower blood sugar levels and promote weight loss.  Initially approved by the U.S. Food and Drug Administration ("FDA") to treat diabetes, GLP-1 agonists, particularly the FDA-approved semaglutide and tirzepatide, have gained considerable attention and popularity after they were approved for the treatment of weight loss in 2023, with social media influencers and celebrities alike touting these medications for their results in this indication.

24.     Throughout the Class Period, Defendants touted the significance of the MOMENTUM Trial's results to pemvidutide's clinical and commercial prospects as they purportedly evidenced the drug's viability to compete with other GLP-1 agonists targeting weight-loss.  Pemvidutide's ability to compete with other GLP-1 agonists targeting weight-loss was particularly important to analysts and investors given the Company's need to establish a strategic partnership with, or otherwise be acquired by, more established biopharmaceutical companies with the cash and capital needed to ensure funding for the drug's future.

**Materially False and Misleading Statements Issued During the Class Period**

25.     The Class Period begins on December 1, 2023.  On November 30, 2023, during after-market hours, Altimmune issued a press release (the "November 2023 Press Release") announcing topline results from the MOMENTUM Trial, including, *inter alia*, that at week 48, subjects receiving pemvidutide achieved mean weight losses of 10.3%, 11.2%, 15.6% and 2.2% at the 1.2 mg, 1.8 mg, and 2.4 mg doses and placebo, respectively, with a near-linear trajectory of continued weight loss observed on the 2.4 mg dose at the end of treatment.  Defendant Garg commented on the purported significance of these results in the November 2023 Press Release, stating, in relevant part:

> This is an important day for Altimmune and we couldn't be more pleased with these results . . . . To put these results in context, the 15.6% mean weight loss observed with the 2.4 mg dose was associated with a mean weight loss of 32.2 lbs at 48 weeks. The impact of this level of weight loss on patients can be significant. For example, 48% of subjects on the 2.4 mg dose with baseline obesity no longer had obesity at the end of the 48-week trial . . . . We believe the magnitude of weight loss, robust reductions in triglycerides, LDL cholesterol and blood pressure, together with the safety profile observed in this trial, could potentially differentiate pemvidutide from the other incretin-based therapies. If approved, we believe pemvidutide could offer an important option for obesity patients, including those with risk factors for cardiovascular disease.

26.     Also on November 30, 2023, during after-market hours, Altimmune filed a current report on Form 8-K with the SEC, signed by Defendant Eisenstadt.  Appended as an exhibit to the Form 8-K was the November 2023 Press Release, containing the same statements made by Defendant Garg as referenced in ¶ 25, *supra*, touting pemvidutide's efficacy and tolerability results observed in the MOMENTUM Trial and their significance in differentiating pemvidutide from similar drugs.

27.     The statements referenced in ¶¶ 25-26 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse

facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Altimmune overstated the potential for pemvidutide to stand out from competing GLP-1 agonists based on the drug's efficacy and tolerability results observed in the MOMENTUM Trial; (ii) accordingly, the MOMENTUM Trial results were less significant to pemvidutide's clinical, commercial, and competitive prospects than Defendants had led investors to believe; (iii) as a result of all the foregoing, Defendants had overstated Altimmune's prospects for finding a strategic partner to develop pemvidutide; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

28.     On February 13, 2024, shortly after markets opened, Kerrisdale Capital published a report alleging that "a deeper examination of Altimmune's data reveals a drug with little chance of competing against either the approved incumbents or the other GLP-1 agonists progressing through clinical trials."  In particular, the Kerrisdale Report found that "[e]ven if pemvidutide *did* result in 15.6% weight-loss, that's not good enough" because competing, already approved GLP-1 agonists "semaglutide and tirzepatide (Ozempic and Mounjaro) have demonstrated superior weight-loss on a comparable basis, with the added benefit of controlling blood-sugar (which pemvidutide does not)," while noting that "pemvidutide's tolerability is atrocious" compared to these same drugs.  (Emphasis in original.)  Accordingly, the Kerrisdale Report concluded that "[w]e don't think legitimate prospective partners want to spend hundreds of millions of dollars and years of trials pursuing an obvious dead end."

29.     For example, with respect to pemvidutide's efficacy observed in the MOMENTUM Trial as compared to competing GLP-1 agonists, the Kerrisdale Report stated, *inter alia*:

**Pemvidutide is less effective than current GLP-1 drugs and its headline weight-loss figure is suspect.** On the metric that everyone really cares about – weight-loss – pemvidutide is inferior to semaglutide and tirzepatide, the two approved weight-loss drugs known as Wegovy and Zepbound (or Ozempic and Mounjaro when used for diabetes). In the phase-2 data that provoked the recent tripling of Altimmune's stock price, patients on pemvidutide's highest dose lost 15.6% of their bodyweight, or 13.4% more than placebo, at the 48-week mark. That's about the same as semaglutide-2.4mg and much less than the 17-18% weight-loss induced by the 10mg and 15mg doses of tirzepatide, also at 48 weeks. That comparison actually understates the superiority of semaglutide and tirzepatide, which had patients slowly titrate up to the treatment dose over 3-4 months instead of the 4 weeks in the pemvidutide trial. Further, those already-approved drugs also control blood-sugar (which pemvidutide does not) and have massive libraries of clinical studies as well as countless physician experiences that support their everyday use. Pemvidutide has no chance of competing with them if the best it could do is equal their weight-loss result.

We also think that weight-loss result is questionable and won't hold up in a large phase-3 trial. Over the course of 4 trials and 6 data readouts, the 48-week 15.6% result is *the only time* that pemvidutide's 2.4mg dose demonstrated any statistical superiority to its 1.8mg dose, and even in this phase-2 trial, that superiority only crystallized at the 32-week mark. That fact pattern is strange in light of what we know about the dose-response curves of other GLP-1 drugs and how they evolve over time. We believe that the 15.6% result was partly a statistical fluke and that in a large phase-3 trial, the weight-loss effectiveness of pemvidutide-2.4mg will be much closer to the 1.8mg experience and lower than 15.6%.

(Emphases in original.)

30.     With respect to pemvidutide's tolerability observed in the MOMENTUM Trial as

compared to other GLP-1 agonists, the Kerrisdale Report stated, *inter alia*:

**Pemvidutide's phase-2 tolerability profile was graded on a curve and it was still awful.** Altimmune ran its pemvidutide phase-2 trial from mid-2022 to late-2023. By this time, Ozempic and Mounjaro had become household names, Hollywood stars were rumored to be using the drugs for weight-loss, and social media influencers were flaunting weight-loss results. At the same time, manufacturing issues at Novo Nordisk created a shortage of semaglutide, and neither semaglutide nor tirzepatide – which cost over $1000/month out-of-pocket – were covered by insurers or Medicare for weight loss (coverage is still spotty as of this writing). In that context, the pemvidutide trial was an opportunity for interested patients to get unfettered access to perhaps the hottest pharmaceutical product in history for free. Participants knew that there were likely to be GI side-effects like nausea, diarrhea, and vomiting, because these side-effects were well-known. And yet, across the different pemvidutide dose-arms *36% of trial*

9

*participants discontinued their use of the drug*. In the 2.4mg cohort, the one that resulted in 15.6% weight-loss at 48 weeks, *42% of participants discontinued the drug* (which makes that statistical fluke more likely). The equivalent numbers for semaglutide and tirzepatide are in the 15-17% range. It's hard not to conclude that pemvidutide is uniquely intolerable.

Altimmune's management has tried to frame this intolerability in as pleasant a light as possible, even claiming that similar levels of trial discontinuation were seen in the semaglutide and tirzepatide phase-2s . . . . [P]atient compliance rates in every relevant semaglutide and tirzepatide trial – both those from phase-2 and phase-3 – refute Altimmune's claims. At best, Altimmune's management is cherry-picking statistics. Other times, they're simply making claims that are factually untrue. A drug with the compliance rate that pemvidutide displayed in its phase-2 trial – especially given the insatiable and pervasive demand for weight-loss drugs during the trial period – has zero chance of physician or patient buy-in.

(Emphases in original.)

31.     Moreover, with respect to how pemvidutide's tolerability results would lead to comparatively worse results in a Phase 3 trial required for FDA approval, the Kerrisdale Report stated, *inter alia*:

**<u>The awful tolerability profile of pemvidutide will make headline weight-loss results of a phase-3 trial look like a disaster.</u>** The FDA requires headline phase-3 weight-loss results to be reported in the form of a "treatment effect," i.e., *inclusive of patients who discontinued treatment during the trial*. This is how both Novo and Lilly reported their phase-2 and phase-3 results for semaglutide and tirzepatide, respectively. Altimmune…did not do that. Instead, the only result reported for pemvidutide was the "hypothetical effect," which uses statistical techniques to estimate hypothetical trial results had no patients discontinued treatment. This is allowed for phase-2, but a) it's aggressive not to report the treatment effect and b) they won't be able to pull that off for their phase-3 trial, because it goes against the FDA's guidance.

The FDA does allow for reporting both sets of results – the treatment effect *and* the hypothetical effect. Both Novo and Lilly did this for the phase-3 results of semaglutide and tirzepatide, and the difference between the two reporting methodologies was about 2% (e.g., semaglutide would have resulted in a *hypothetical* 16.9% weight loss if all participants remained on the drug the entire trial, but actual headline weight-loss was 14.9% because in reality about 17% of participants discontinued and they didn't lose as much weight). Why didn't Altimmune also report both sets of results? Well, a 42% discontinuation rate will result in a massive gap between the real-world treatment effect (which Altimmune will have to report for phase-3) and the hypothetical effect. We estimate that a

discontinuation rate of about 40% would result in a gap of 4.5-5.5% between the two results, which means that the "real" headline weight-loss result in Altimmune's pemvidutide phase-2 was probably in the 10-11% range rather than the 15.6% reported. That kind of result in a phase-3 is likely to completely tank the company.

(Emphases in original.)

32.     On this news, Altimmune's stock price fell $1.94 per share, or 18.65%, to close at $8.46 per share on February 13, 2024.  Despite this decline in the Company's stock price, Altimmune securities continued trading at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misstatements and omissions regarding the potential for pemvidutide to stand out from competing GLP-1 agonists based on the drug's efficacy and tolerability results observed in the MOMENTUM Trial, as well as the true prospects of Altimmune finding a strategic partner to develop pemvidutide and fund the drug's future based on these results.

33.     For example, on March 27, 2024, Altimmune issued a press release (the "March 2024 Press Release") announcing additional purported positive data for pemvidutide, as well as the Company's fourth quarter and full year 2023 results.  The March 2024 Press Release quoted Defendant Garg, who stated, in relevant part:

> We are extremely pleased with the results of the body composition analysis from our recently completed MOMENTUM 48-week Phase 2 obesity trial of pemvidutide . . . . Based on compelling weight loss, a clean safety profile, robust reductions in serum lipids and blood pressure, and now preservation of lean mass observed in our clinical trials, we believe that pemvidutide has the potential to distinguish itself broadly from other therapies for the treatment of obesity.

34.     The March 2024 Press Release also quoted Defendant Harris, who stated, in relevant part, that "[g]iven these new body composition data, the robust reductions in serum lipids, and the class-leading reduction of hepatic fat content, we believe that pemvidutide, if approved, could stand out as an attractive option for weight loss and weight maintenance."

35.     Also on March 27, 2024, Altimmune filed a current report on Form 8-K with the SEC, signed by Defendant Eisenstadt.  Appended as an exhibit to the Form 8-K was the March 2024 Press Release, containing the same statements made by Defendants Garg and Harris as referenced in ¶¶ 33-34, *supra*, touting pemvidutide's clinical, commercial, and competitive prospects, including its purported ability to "distinguish itself broadly from other therapies for the treatment of obesity" and "stand out as an attractive option for weight loss and weight maintenance."

36.     The same day, Altimmune held a conference call (the "March 2024 Earnings Call") with investors and analysts to discuss the Company's fourth quarter and full year 2023 results.   In his prepared remarks on the March 2024 Earnings Call, Defendant Garg continued to tout the significance of the MOMENTUM Trial's results to pemvidutide's clinical, commercial, and competitive prospects, while representing that "the impressive body composition data further distinguishes pemvidutide from other compounds in development for the treatment of obesity."

37.     Also during his prepared remarks on the March 2024 Earnings Call, Defendant Harris stated, in relevant part:

> [L]et me tell you about the compelling body composition analysis from the MOMENTUM trial, which showed that 74% of weight loss came from adipose issue, and only 25.5% due to lean mass, comparable to the effects historically associated with diet and exercise programs. These data are among the best results achieved with incretin-based obesity drugs.

> With an increasing number of anti-obesity candidates in development, there is growing evidence emphasis on the type and quality of weight loss where the ability to preserve lean body mass has been viewed as an important differentiator in the treatment of patients with obesity.

38.     During the question-and-answer portion of the March 2024 Earnings Call, in response to an analyst question regarding "where you are with part[nership] discussions currently"

"given the continued desirable product profile of pemvidutide," Defendant Garg responded, in relevant part:

> In terms of partnering discussions, the status of partnering discussions, we are having robust discussions with companies that are both scientific and technical in nature as well as business-related discussions. As you can imagine, each company has their own particular focus, but they're all appropriate, they all appreciate pemvidutide comprehensive and differentiated profile.
>
> So overall, we are pleased with the scientific and business discussions to date, and we will update as things develop in the future.

39.     In a follow-up question from another analyst asking for additional color on the nature of the partnership discussions Altimmune was having for the development of pemvidutide, Defendant Garg stated, in relevant part:

> [L]ook, in terms of discussions with partners, as you can imagine, the different companies have different focus, but everybody is appreciating the cardiovascular benefit of pemvidutide. And that's what is driving these discussions. It's obesity with cardiovascular benefit, all of the things we've been talking about in terms of the lipid profile, the serum lipids, the liver fat content and blood pressure.
>
> So all of these things combined, we believe, will have significant impact, not just people losing weight, but ultimately, the cardiovascular outcomes in these. So a lot of the discussions are driven by that. We're very encouraged because that's the value proposition that we think we bring to the table and people are getting it, people are appreciating it. And the question is, is this an obesity partnership, cardiovascular partnership or MASH partnership or all of those combined together.
>
> So in terms of MASH, as you know, we are moving forward with the with the program. We'll have our Phase IIb data in the first quarter of 2025 and that will drive that program further. Clearly, in MASH, we are highly differentiated, both in obesity and MASH, we are highly differentiated. But in terms of other glucagon program being there, we are differentiated from that also.

40.     In response to another analyst's question regarding "how much [partnership] discussion is contingent upon this more detailed Phase II obesity MOMENTUM data," Defendant Garg responded, in relevant part:

The partners are clearly getting the message in terms of the value proposition, the differentiation that pemvidutide brings. And therefore, we're very excited about those discussions.

41.     In response to another analyst's request for "color on some of the kind of feedback you're getting from potential partners as it relates to dose and Phase III strategy," Defendant Garg stated, in relevant part:

I mean as you can imagine, partners are looking to differentiate going forward. I mean, if you are a third or fourth or fifth company launching a drug in the obesity space, the idea of having yet another GLP-1 or even a GLP-1/GIP without differentiation, it's going to be difficult.

So therefore, we believe having the mechanism adding addition of the glucagon mechanism is very attractive, particularly to new players getting into the obesity space because, again, differentiation is going to be the key to commercially to successfully launch a product in obesity space going forward. So we are really very encouraged by the fact that, that's what partners are focusing on.

\* \* \*

So I think . . . we bring a very differentiated approach or a very differentiated product. So we are very encouraged by those discussions, particularly by the fact that the partners are actually getting it and focusing on it.

42.     Also on March 27, 2024, Altimmune filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2023 (the "2023 10-K").  The 2023 10-K downplayed risks that "may" or "could" occur "if" Altimmune failed to attract strategic partners for the development of its product candidates, including pemvidutide, stating, in relevant part:

***We may not be successful in establishing and maintaining strategic partnerships, which could adversely affect our ability to develop and commercialize products.***

A key part of our strategy is to seek strategic partnerships in the future, including potentially with major biotechnology or pharmaceutical companies for late-stage development and commercialization of our product candidates. We face significant competition in seeking appropriate partners for our product candidates, and the negotiation process is time consuming and complex. In order for the Company to successfully partner our product candidates, potential partners must view these

14

product candidates as economically valuable in markets they determine to be attractive in light of the terms that we are seeking and other products available for licensing from other companies . . . . Any delay in entering into strategic partnership agreements related to our product candidates ***could*** delay the development and commercialization of our product candidates and reduce their competitiveness even if they reach the market.

* * *

***If*** we fail to establish . . . strategic partnerships related to our product candidates, including pemvidutide, we will bear all of the risk and costs related to the development of any such product candidate, and we ***may*** need to seek additional financing, hire additional employees and otherwise develop expertise which we do not have and for which we have not budgeted. This ***could*** negatively affect the development of any unpartnered product candidate and materially affect our business and financial condition.

(First emphasis in original.) Plainly, the foregoing risk warning was a generic "catch-all" provision that was not tailored to Defendants' actual known risks regarding Altimmune's true prospects of finding a strategic partner to develop pemvidutide and fund the drug's future.

43.     Appended as exhibits to the 2023 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Garg and Eisenstadt certified that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

44.     The statements referenced in ¶¶ 33-43 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Altimmune overstated the

15

potential for pemvidutide to stand out from competing GLP-1 agonists based on the drug's efficacy and tolerability results observed in the MOMENTUM Trial; (ii) accordingly, the MOMENTUM Trial results were less significant to pemvidutide's clinical, commercial, and competitive prospects than Defendants had led investors to believe; (iii) as a result of all the foregoing, Defendants had overstated Altimmune's prospects for finding a strategic partner to develop pemvidutide; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Fully Emerges

45.    On April 29, 2024, during pre-market hours, *Bloomberg* published an article entitled "Altimmune Down as Guggenheim Sees Overhang in No Partnership," reporting, in relevant part:

> Altimmune shares drop 5.9% in premarket trading Monday after Guggenheim Securities downgraded the stock to neutral from buy saying [a] partnership for the biotech's lead asset pemvidutide look[s] "increasingly unlikely."
>
> Analyst Seamus Fernandez says the opportunity to successfully fund pemvidutide's future in either obesity or fatty liver disease is "growing increasingly tenuous[.]"
>
> "The failure of a partner to emerge now five months from the end of Ph[ase] 2 presents an overhang that can no longer be ignored," Fernandez writes in a note[.]
>
> Says "a major partnership or M&A event would have materialized already if pem[vidutide] was viewed as a serious competitor in the growing obesity/ NASH landscapes by potential strategics or investors[.]"
>
> Adds that Altimmune's low stock price further limits the ability to successfully advance pemvidutide to late-stage trials in either obesity or nonalcoholic steatohepatitis (NASH)[.]

46.    On this news, Altimmune's stock price fell $0.87 per share, or 11.98%, to close at $6.39 per share on April 29, 2024.

47.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

48.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Altimmune securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Altimmune securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may

be identified from records maintained by Altimmune or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Altimmune;

- whether the Individual Defendants caused Altimmune to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Altimmune securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

55.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Altimmune securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Altimmune securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

56.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

57.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

58.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Altimmune securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Altimmune securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

61.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Altimmune securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Altimmune's finances and business prospects.

62.     By virtue of their positions at Altimmune, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

63.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Altimmune, the Individual Defendants had knowledge of the details of Altimmune's internal affairs.

64.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Altimmune.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Altimmune's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

the market price of Altimmune securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Altimmune's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Altimmune securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

65.     During the Class Period, Altimmune securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Altimmune securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Altimmune securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Altimmune securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating false and misleading statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

68.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.     During the Class Period, the Individual Defendants participated in the operation and management of Altimmune, and conducted and participated, directly and indirectly, in the conduct of Altimmune's business affairs.  Because of their senior positions, they knew the adverse non-public information about Altimmune's false and misleading statements as alleged herein.

70.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Altimmune's financial condition and results of operations, and to correct promptly any public statements issued by Altimmune which had become materially false or misleading.

71.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Altimmune disseminated in the marketplace during the Class Period concerning Altimmune's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Altimmune to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Altimmune within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Altimmune securities.

72.     Each of the Individual Defendants, therefore, acted as a controlling person of Altimmune.  By reason of their senior management positions and/or being directors of Altimmune, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Altimmune to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Altimmune and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Altimmune.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  May 6, 2024      Respectfully submitted,

/s/ Daniel S. Sommers
Daniel S. Sommers (Md. Bar No. 15822)
S. Douglas Bunch
(*pro hac vice* application forthcoming)
**COHEN MILSTEIN SELLERS &**
 **TOLL PLLC**
1100 New York Avenue N.W.
Suite 500, East Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email: dsommers@cohenmilstein.com
   dbunch@cohenmilstein.com

*Liaison Counsel for Plaintiff*

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
   ahood@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, _Joseph Mogan_____, make this declaration

pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private

Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Altimmune, Inc. ("Altimmune") and authorize

the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Altimmune securities at the direction of plaintiffs'

counsel or in order to participate in any private action arising under the Securities Act or Exchange

Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who

purchased or otherwise acquired Altimmune securities during the Class Period as specified in the

Complaint, including providing testimony at deposition and trial, if necessary.  I understand that

the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Altimmune securities during the

Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is

signed, I have not served or sought to serve as a representative party on behalf of a class under the

federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of

the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such

reasonable costs and expenses directly relating to the representation of the class as ordered or

approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


**Executed** _____
3/19/2024
                        **(Date)**

                                          DocuSigned by:

                                          _____
                                          (Signature)  0D49287AFB52468...

                                          Joseph Mogan
                                          _____
                                              **(Type or Print Name)**

**Altimmune, Inc. (ALT)**                                                                                          **Joseph Mogan**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Account 1 | | | |
| Purchase | 12/27/2023 | 348 | $11.0050 |
| Purchase | 12/27/2023 | 14,224 | $10.9687 |
| Purchase | 12/27/2023 | 14,711 | $11.9500 |
| Purchase | 1/3/2024 | 2,092 | $9.5500 |
| Purchase | 1/8/2024 | 447 | $10.9229 |
| Purchase | 1/10/2024 | 287 | $11.4800 |
| Purchase | 1/16/2024 | 11 | $11.6599 |
| Purchase | 1/16/2024 | 331 | $11.6499 |
| Purchase | 1/19/2024 | 214 | $10.1395 |
| Purchase | 2/16/2024 | 294 | $8.7899 |
| Purchase | 3/6/2024 | 42 | $11.0986 |
| Purchase | 3/18/2024 | 4 | $9.4500 |
| Purchase | 3/18/2024 | 111 | $9.4000 |
| Purchase | 3/21/2024 | 3 | $9.3700 |
| Purchase | 3/21/2024 | 131 | $9.3700 |
| Purchase | 4/15/2024 | 26 | $7.5300 |
| Sale | 12/27/2023 | (14,711) | $10.5161 |
| Account 2 | | | |
| Purchase | 4/9/2024 | 1 | $8.3988 |